**IN THE UNITED STATES DISTRICT COURT**
**FOR NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE of ILLINOIS and the CITY of CHICAGO *ex rels.* DIANA HOLDEN, Relator and TERESA BROWN, Relator, | 11cv7809<br>Judge James F. Holderman<br>Magistrate Michael T. Mason |
| Plaintiffs, | |
| v. | **FILED IN CAMERA AND UNDER SEAL PURSUANT THE FEDERAL, ILLINOIS, AND CHICAGO FALSE CLAIMS ACTS** |
| NORTHWESTERN ORTHOPAEDIC INSTITUTE, LLC and its successors, MARK BOWEN, ADAM BENNETT, CHARLES CARROLL, ARMEN KELIKIAN, SRDJAN MIRKOVIC, MARK NOLDEN, and DIANNE SHANABRUCH, | JURY TRIAL DEMANDED |
| Defendants. | |

**COMPLAINT**


Robin Potter, # 3123932
Denise M. Quimby, # 6286565
Robin Potter & Associates, PC
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Phone: (312) 861-1800
Fax: (312) 861-3009
*robin@potterlaw.org*
*denise@potterlaw.org*

Mark Hanna
Lorrie Bradley
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006
Phone: (202) 223-2620
Fax: (202) 223-8651
*mhanna@murphypllc.com*
*lbradley@murphypllc.com*

Ann Lugbill
Murphy Anderson PLLC
2406 Auburn Avenue
Cincinnati, OH 45219
Phone: (513) 784-1280
Fax: (877) 784-1499
*alugbill@murphypllc.com*


FILED

NOV 0 3 2011 NF

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# TABLE OF CONTENTS


I. INTRODUCTION . . . . . 1

II. JURISDICTION AND VENUE . . . . . 3

III. PARTIES . . . . . 4

IV. REGULATORY FRAMEWORK . . . . . 6

A. Federal Government Health Programs . . . . . 6

B. State and City Health Programs . . . . . 9

C. The False Claims Act . . . . . 10

D. Illinois False Claims Act . . . . . 11

E. City of Chicago False Claims Act . . . . . 11

V. SPECIFIC ALLEGATIONS OF DEFENDANTS' VIOLATIONS OF LAW . . . . . 11

A. Fraudulent Billing for Office Visits . . . . . 11
1. "Upcoding" for Office Visits . . . . . 11
2. False Documentation of Office Visits . . . . . 15

B. Fraudulent Billing for Arthroscopic Knee Surgeries . . . . . 16

C. Fraudulent Billing for Surgical Assistants . . . . . 19

D. Fraudulent Billing for Platelet Rich Plasma ("PRP") Injections . . . . . 21

E. Fraudulent Billing for Physical and Occupational Therapy Services . . . . . 22

F. Wound Debridement by Unlicensed Providers . . . . . 24

G. MRIs . . . . . 26

VI. CLAIMS FOR RELIEF . . . . . . . . . . 28

COUNT I
False Claims Act - Presentation of False Claims
31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A) as amended in 2009 . . . . . . . . . . 28

COUNT II
False Claims Act - Making or Using False Record or Statement to Cause Claim to be Paid
31 U.S.C. § 3729(a)(2), 31 U.S.C. § 3729(a)(1)(B) as amended in 2009 . . . . . . . . . . 29

COUNT III
False Claims Act - Making or Using False Record or Statement to Conceal, Avoid and/or Decrease Obligation to Repay Money
31 U.S.C. § 3729(a)(7), 31 U.S.C. § 3729(a)(1)(G) as amended in 2009 . . . . . . . . . . 29

COUNT IV
Illinois False Claims Act
740 Ill. Comp. Stat. 175/1 *et seq.* . . . . . . . . . . 29

COUNT V
The City of Chicago False Claims Act
Chicago Municipal Code, § 1-22-010 *et seq.* . . . . . . . . . . 30

COUNT VI
False Claims Act Retaliation Violation
31 U.S.C. § 3730(h) . . . . . . . . . . 31

COUNT VII
Illinois False Claims Act
740 Ill. Comp. Stat. 175/4(g) . . . . . . . . . . 33

COUNT VIII
City of Chicago False Claims Act Retaliation Violation
Chicago Municipal Code, § 2-152-171 . . . . . . . . . . 34

COUNT IX
Illinois State Public Policy Tort- *Palmateer* Claim . . . . . . . . . . 34

## I. INTRODUCTION

1. *Qui tam* Relators Diana Holden and Teresa Brown bring this action in the name of the United States Government, the State Government of Illinois, and the City of Chicago for false claims that were submitted or caused to be submitted to the United States Government, the State Government of Illinois, and the City of Chicago, by Defendant Northwestern Orthopaedic Institute, LLC (also referred to as "Northwestern Orthopaedic Institute" or "NOI") and individual defendants Mark Bowen, Adam Bennett, Charles Carroll, Armen Kelikian, Srdjan Mirkovic, and Dianne Shanabruch.

2. NOI engaged in a practice of intentionally fraudulent billing Federal, State, and City health programs and plans for physician and other health care services, including intentionally billing under improper codes to maximize revenue to the practice, "upcoding" or billing for high-complexity office visits which were not justified by the level of service provided, billing for services that were outside the scope of coverage, and billing for services rendered by providers who were improperly supervised or not licensed to perform specific treatments.

3. This case is brought pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, and pursuant to analogous provisions of Illinois and Chicago law, to recover treble damages and civil penalties on behalf of the United States of America, the State of Illinois, and the City of Chicago, arising from false or fraudulent claims for reimbursements for medical treatment that were submitted or caused to be submitted by NOI and the individual Defendants to federal government-funded programs including, without limitation, Medicaid, Medicare, the Federal Employees Health Benefits Program, and TRICARE/CHAMPUS, in violation of the False Claims Act. The False Claims Act specifically

proscribes NOI's and the individual Defendants' conduct involving fraudulent billing, and thus the submission of false or non-reimbursable claims to Medicaid and other government-funded health programs. The medical treatments encompassed by this complaint include office visits, arthroscopic knee surgery, surgical assistance, platelet rich plasma ("PRP") injections, physical and occupational therapy, wound debridement, and MRI imaging.

4. Relators Diana Holden and Teresa Brown, two former employees of NOI, became aware of NOI's False Claims Act violations and other illegal practices in the course of their work supervising coding and billing and managing the practice's main office.

5. Defendants' False Claims Act violations and their various fraudulent billing schemes unlawfully increased costs to the United States, the State of Illinois, and the City of Chicago for medical services. Defendants knew or should have known that their unlawful activities constituted the filing of false claims for reimbursement from the Federal, State, and City governments in violation of the False Claims Act, and involved violations of Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395f and 1395cc, Medicare regulations, and similar State laws.

6. Defendants' scheme illegally charged government health programs and plans for medical treatment that was not covered or not provided under required guidelines, and overcharged government health programs and plans for covered treatment. The Federal, State, and City governments consequently paid claims that they would have rejected had each been aware of NOI's illegal actions. Moreover, as a result of NOI's illegal billing practices, reimbursement costs to the Federal, State, and City governments increased, while NOI profited.

7. Relators have direct and independent personal knowledge of the Defendants' illegal marketing practices as a result of their extensive experience with the company during their

employment and their previous experience with billing, coding, and office management for physicians, hospitals, and other health care institutions. Relators bring this action on behalf of themselves, the United States of America, the State of Illinois, and the City of Chicago for violations of the United States False Claims Act, the Illinois False Claims Act, and the City of Chicago False Claims Act.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction to this Court over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court also has subject matter jurisdiction over the counts relating to the Illinois and Chicago False Claims Acts pursuant to 31 U.S.C. § 3732(b), 740 ILCS §§175/1 et. seq., as well as supplemental jurisdiction over the counts relating to the State and City False Claims Acts pursuant to 28 U.S.C. § 1367.

9. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because acts prohibited by 31 U.S.C. § 3729 occurred in this state and this judicial district. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because one or more acts proscribed by 31 U.S.C. § 3729 occurred in this district.

10. In accordance with 31 U.S.C. § 3730(b)(2) and the Illinois and Chicago False Claims Acts, this Complaint is filed under seal and will remain under seal for a period of at least 60 days from its filing date, or such other date as is required by law or the Court so orders, and shall not be served upon the Defendants unless the Court so orders.

11. This suit is not based upon prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation, in a Government Accountability Office or Auditor General's report, hearing, audit, or investigation, from the news

media, or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730 (e)(4)(A), amended by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1313(j)(2), 124 Stat. 901-902 (2010). Relators have, however, affirmatively disclosed the allegations herein to the United States Government, the State of Illinois, and the City of Chicago, including prior to filing this Complaint.

12. To the extent that there has been a public disclosure of the information upon which the allegations of this Complaint are based that is unknown to Relators, Relators are an original source of this information as defined in 31 U.S.C. § 3730(e)(4)(B), amended by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1313(j)(2), 124 Stat. 901-902 (2010) and similar state law provisions. Relators possess direct and independent knowledge of the information as a result of an extensive independent investigation they personally conducted into Defendants' wrongdoing, which they acquired in the course of their employment with Defendant and thereafter, as a result of their investigation. Relators voluntarily provided the government with this information prior to filing this action. *See* 31 U.S.C. § 3730(e)(4).

## III. PARTIES

13. Relator Diana Holden was the NOI Coding/Billing Manager from August 2010 to May 2011. She supervised employees in the practice's coding and billing department responsible for posting charges for office visits, surgery, and other medical treatment, coding the treatment using the appropriate Current Procedural Terminology ("CPT") codes, and billing patients and health plans. When she began her position, Relator Holden spent time with each employee in the coding and billing department to gain knowledge of the practice's billing procedures and each employee's function.

14. Relator Holden has 30 years of experience in the medical coding and billing field. Prior to working at NOI, she served as a compliance officer, billing manager, and coding manager at various hospitals, medical practices, and health care institutions. She also owned and operated her own consulting business to advise physicians and medical practices on proper coding and billing. Relator Holden served on the board of the American Academy of Professional Coders from 2008-2011.

15. Relator Teresa Brown was the NOI Front Office Manager from August 2010 to August 2011. She was responsible for managing patient check-in and check-out, collecting patient balances, setting up payment plans, and scheduling patient visits. When she began her position, Relator Brown spent time in the coding and billing department so that she could gain familiarity with the billing process in order to help the office run more smoothly.

16. Relator Brown has extensive experience as a manager at hospitals and health care facilities. She worked as a manager in the Admissions and Accounts Receivable departments of Children's Hospital in Denver and as a billing supervisor at Denver Health. She has also worked as a financial manager at a private practice medical clinic.

17. Defendant Northwestern Orthopaedic Institute, LLC ("NOI") is a private medical practice. The NOI business entity was formed in 2008, with its main office located in downtown Chicago, Illinois at 680 North Lake Shore Drive, Suite 924. NOI also maintains a smaller office in Glenview, Illinois, a suburb northwest of Chicago, at 2501 Compass Road, Suite 125. Fourteen physicians practice at NOI, twelve of whom are owners of the practice. The owners are Doctors Mark Bowen, Adam Bennett, Steven Kodros, Armen Kelikian, Raju Ghate, Gordon Nuber, Mark Nolden, Srdjan Mirkovic, Victoria Anne Brander, Richard Wixson, David Stulberg, and Charles Carroll. Doctors Cherise Russo and Mark Dolan practice at NOI but are not owners.

Physicians at NOI treat patients with musculoskeletal injuries through surgery or nonsurgical means such as physical therapy. Effective 2012, NOI has been acquired by North Shore University Health System, which owns several hospitals in the Chicago area.

18. NOI accepts Medicare and private insurance, including the insurance plans for employees of the State of Illinois and the City of Chicago. NOI physicians often see patients for work-related injuries that are covered under the Illinois workers' compensation system, including employees of the City of Chicago's police and fire departments. In addition, NOI accepts a limited number of Medicaid patients.

19. Six of the individual Defendants, Mark Bowen, Adam Bennett, Charles Carroll, Armen Kelikian, Srdjan Mirkovic, and Mark Nolden are physicians who practice at NOI. The seventh, Dianne Shanabruch, is the practice's Executive Director who was responsible for setting and enforcing policies regarding coding and billing. All seven individual Defendants participated in and had knowledge of the False Claims Act violations.

## IV. REGULATORY FRAMEWORK

### A. Federal Government Health Programs

20. The Federal, State, and City governments, through government health programs such as Medicaid, Medicare, TRICARE, and government employee health benefit plans, are among the principal payors for medical services rendered at Northeastern Orthopaedic Institute, LLC. The allegations in this complaint apply to all health care programs funded by the Federal government, the State of Illinois, or the City of Chicago.

21. Medicare is a Federal government program primarily benefitting the elderly that was created by Congress in 1965 when it adopted Title XVIII of the Social Security Act. Medicare is administered by the Center for Medicare and Medicaid Services. Medicare Part A

covers medical care for patients admitted to the hospital, while Medicare Part B covers doctor's visits and medical care provided on an outpatient basis.

22. Medicaid is a public assistance program that provides payment of medical expenses to low-income and disabled patients. Congress created Medicaid at the same time it created Medicare in 1965 by adding Title XIX to the Social Security Act. Funding for Medicaid is shared between the Federal government and those State governments choosing to participate in the program. Medicare and Medicaid are administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency which sets standards and regulations for participation in the programs.

23. TRICARE is the health care system of the United States military, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and military retirees and their dependents. The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers. TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations, and fee-for-service benefits.

24. The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for nearly 8.7 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel Management. The federal government

also provides health benefits through other programs, including, but not limited to, those administered by the Department of Labor.

25. The Medicare program works by reimbursing health care providers for the cost of services and ancillary items at fixed rates. Reimbursements are made out of the Medicare Trust Fund. The Medicare Trust Fund is supposed to reimburse health care providers, such as Defendants, only for those services that were actually performed and were medically necessary for the health of the patient and that were ordered specifically by a physician, using appropriate medical judgment and acting in the best interest of the patient. The Medicare Trust Fund relies on the implied representations of the suppliers of Medicare services, reimbursable in whole or in part under Medicare, that the services billed by the providers are medically necessary for the patient and are actually performed as billed and compensable by Medicare. The other government-funded programs described above operate in a similar fashion.

26. Medicare and other Government healthcare programs require that the service had to be physically performed and billed accurately and according to Medicare policies and procedure code. CMS requires healthcare providers' certifications that they complied with all laws and regulations governing the provision of health care services. These certifications are an absolute condition precedent to retaining the Medicare funds conditionally advanced by the United States and a prerequisite to continued future participation in the Medicare program. Without such certification, Defendants are required to repay all Medicare payments previously received.

27. Under the Medicare program, regional intermediaries acting for Medicare set the compensation rates for services by assigning a specific provider reimbursement payment amount for all five digit Medicare codes, known as the Current Procedural Terminology code or the CPT

code. The CPT system and other similar coding systems identify with particularity the nature of the service performed. The other Government health care programs operate similarly. But for Defendant's certifications of compliance with these requirements, impliedly or otherwise, the United States would not reimburse Defendants for claimed services.

**B. State and City Health Programs**

28. The State of Illinois provides health care benefits to state employees and retirees through four programs. The State Employee Insurance and Benefit Programs provide health insurance benefits to employees of state agencies. Seven health maintenance organizations or HMOs offer coverage to state employees in various geographical regions of the state. In addition, the Quality Health Care Plan is administered by Cigna and offers comprehensive health care coverage through a network of health care providers. Local government employees are covered by the Local Government Health Plan, which covers employees of cities, towns, village, and other entities as allowed under state law. The State of Illinois provides health care coverage to retirees of the state's public colleges and school systems through the College Insurance Plan and the Teachers' Retirement Insurance Plan. The Local Government Health Plan, College Insurance Plan, and Teachers' Retirement Insurance Plan also allow employees to choose between managed care and comprehensive health insurance plans administered by Cigna.

29. The State of Illinois Medicaid program is administered by the Illinois Department of Healthcare and Family Services. Qualifying state residents can choose between fee-for-service and managed care programs. The State of Illinois also administers the Illinois Comprehensive Health Insurance Plan (ICHIP), for people who have been denied major medical coverage due to a health condition and are not eligible for Medicare. ICHIP offers a traditional health plan through a preferred provider organization (PPO) as well as a high deductible health plan.

30. City of Chicago employees are given a choice between a Blue Cross Blue Shield PPO plan and a Blue Cross health maintenance organization ("HMO"). Employee participation in these plans is also subject to requirements of collective bargaining agreements.

31. Illinois state law requires employers to provide workers' compensation insurance coverage to almost all employees in the state. The Illinois Workers' Compensation Act, 820 Ill. Comp. Stat. 305, applies to public employees, including State of Illinois employees, employees of cities, towns, school districts, and other public bodies.

32. NOI was a designated workers' compensation physician for injured employees of the City of Chicago Police and Fire Departments.

**C. The False Claims Act**

33. Originally enacted in 1863, the False Claims Act was substantially amended in 1986 by the False Claims Amendments Act. The 1986 Amendments enhanced the government's ability to recover losses sustained as a result of fraud against the United States. The Act was again amended in 2009 and 2010, further strengthening the law.

34. The False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim to the government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the government. 31 U.S.C. § 3729(a)(1), (2). The False Claims Act empowers private persons who have information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery. The complaint must be filed under seal without service on any defendant. The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to join the action.

35. Knowingly billing a Government health care program for services that were not provided as stated or services that are not covered by the program violates the False Claims Act.

**D. Illinois False Claims Act**

36. The Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 was passed in 1991 and is modeled after the Federal False Claims Act. The State statute covers fraud committed against the State of Illinois and any of its agencies, as well as state colleges and universities. The statute was amended in 2008 to cover fraud committed against units of local governments such as counties and municipalities and school districts. 740 Ill. Comp. Stat. 17/2(a).

**E. City of Chicago False Claims Act**

37. The City of Chicago False Claims Act, Chicago Municipal Code § 1-21-010 *et seq.*, took effect in 2005. It is modeled after the Federal and State false claims statutes. The Chicago False Claims Act covers false claims for which the City of Chicago is the source of any portion of the money or property requested or demanded.

## V. SPECIFIC ALLEGATIONS OF DEFENDANTS' VIOLATIONS OF LAW

**A. Fraudulent Billing for Office Visits**

**1. "Upcoding" for Office Visits**

38. NOI routinely engaged in "upcoding" for office visits, which misrepresented the type and amount of services provided to a patient. By "upcoding," NOI billed for a higher level of service within the code category or series, overstating the level of service provided. NOI engaged in upcoding for office visits between August 2008 and May 2011 and, to the best of Relators' knowledge, continued to do so after May 2011.

39. Billing codes for office visits are based on whether the patient is a new or established patient, as well as the time and effort spent by the provider on evaluation and management of the patient's condition. CPT codes for established patient office visits range from 99211-99215. Codes for new patient office visits range from 99201-99205. Within those ranges, level 5 codes are the most complicated – and most costly – office visits. Level 1 codes are for nurse visits and level 2 codes are for the most basic office visit with a physician.

40. The proper code for an office visit depends on level of evaluation and management services (often referred to as "E&M") provided. The level of evaluation and management is determined by the (1) patient history, (2) examination, and (3) medical decision making that occurs during the office visit. Medicare and insurance companies require documentation of the history, examination, and medical decision making in the patient's medical record.

41. Because the coding for office visits varies with intensity and involves some subjectivity, it provides an opportunity for physicians and other practitioners to overstate the intensity of the service rendered and, as a result, receive greater reimbursement for the service. A recent academic study concluded that as much as 15% of total Medicare expenditures for office visits may be a result of upcoding. Christopher S. Brunt, "CPT Fee Differentials and Visit Upcoding under Medicare Part B," 20 Health Economics 831-841 (2011). That study also concluded that the greater the increase between the fee for one procedure code and the next highest-intensity procedure code, the more likely a physician is to upcode. *Id.*

42. Medicare regulations require documentation in the patient's medical record to support the level of service provided in the office visit. Medicare Claims Processing Manual, CMS Pub. 100-4, ch. 12, § 30.6.1(A). Medicare regulations specifically prohibit "upcoding,"

stating that "[i]t would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted." *Id.*

43. Medicare guidelines specifically address billing for the highest level of office visit codes, the level 5 codes. The guidelines state that in order to bill for a level 5 office visit, the patient history component of the visit must be comprehensive. A comprehensive history must include a review of systems and a complete past family and social history of the patient. For established patients, a physician can review and update the patient's history, but the entire history must be reviewed to qualify as comprehensive and justify billing a level 5 visit. Medicare Claims Processing Manual, CMS Pub. 100-4, ch. 12, § 30.6.1(D).

44. For complex office visits, a higher billing code may be justified based on the time spent on counseling or coordination of care if those services make up over 50% of the face-to-face time the physician spends. Medicare Claims Processing Manual, CMS Pub. 100-4, ch. 12, § 30.6.1(B). If the E&M level selected is based on time, the physician must document "time spent with the patient in conjunction with the medical decision-making involved and a description of the coordination of care or counseling provided. Documentation must be in sufficient detail to support the claim." Medicare Claims Processing Manual, CMS Pub. 100-4, ch. 12, § 30.6.1©. Physicians at NOI never documented the time spent on these issues.

45. Relator Holden observed that there was a high number of office visits coded by defendants as levels 4 and 5, while there were relatively few visits billed at levels 2 and 3. Relator Holden did not believe that the doctors' notes in the patients' files supported the level of office visits billed. She learned from the clinic charge poster, an NOI employee who posted office charges in the computer to the practice's accounting system, that some physicians were instructing the charge poster to bill for these office visits without any supporting documentation

regarding the level or length of the office visit. The documentation would then show up in the patient's file several days or a week later, after the patient had been billed. This meant that the charge poster was unable to verify that the documentation supported the level of office visit. When the documentation was placed in the patient's file, it frequently did not support the CPT level billed.

46. Several physicians at NOI were more involved in decisions about coding and billing than would be expected at a busy orthopedic practice. For example, Dr. Mark Bowen visited the coding and billing department and personally instructed employees to bill charges exactly as he coded them.

47. Some physicians always "upcoded" for all office visits. Drs. Mirkovic and Nolden, who performed spinal surgeries, always coded their office visits as levels 4 or 5, regardless of the length or complexity of the visit. These office visits were coded as high complexity office visits even if the documentation only said, "patient doing fine."

48. Drs. Bennett and Kelikian routinely coded short office visits as levels 4 or 5, with only minimal documentation. When Relator Holden requested a meeting with Dr. Kelikian to discuss coding for office visits, he refused to meet.

49. Some NOI physicians scheduled so many patients per day that they could not have possibly offered the high level of evaluation and management services required to bill for a level 4 or 5 office visit. For instance, Dr. Armen Kelikian commonly scheduled 50 patients for office visits in a four and a half hour time period. This meant that each patient would receive on average only 5 or 6 minutes of time with the doctor.

50. There were approximately 850 to 1000 office visits weekly at NOI's Downtown Chicago location, with another 150 to 200 office visits weekly at the Glenview location. Based upon the billing records that Relator Holden reviewed during her employment, more than 80% of

these patient visits were "upcoded." Most upcoding involved increasing the visit's code by 2 or 3 levels above that which the patient's records supported. The more detailed notes required to support a level 4 or 5 office visit rarely existed. More visits should have been coded as level 2 or 3, but the documentation was so sparse for some office visits that it was not adequate to support billing for even a level 2 visit.

51. According to the 2010 Medicare Physicians' Fee Schedule for participating physicians in Chicago, the difference in payment between a level 2 office visit and a level 4 office visit was approximately $90 for a new patient and approximately $65 for an established patient. The difference between a level 2 office visit and a level 5 was approximately $135 for a new patient and approximately $100 for an established patient. According to NOI's fee schedule prior to March 2010, the difference in payment between a level 2 office visit and a level 4 office visit was approximately $95 for a new patient and approximately $60 for an established patient. The difference between a level 2 and a level 5 office visit was approximately $165 for a new patient and approximately $140 for an established patient. After March 2010, NOI increased its fees. After the increase, the difference between a level 2 and level 4 visit was approximately $135 for a new patient and approximately $90 for an established patient. The difference between a level 2 and a level 5 visit after March 2010 was approximately $240 for a new patient and approximately $200 for an established patient.

52. Relator Brown discussed "upcoding" with Dianne Shanabruch, NOI's Executive Director when she began work at NOI and observed the billing department as part of her orientation. Ms. Shanabruch responded that the physicians "are the owners and we have to do what they say."

53. Relator Brown reported the upcoding of office visits to Dianne Shanabruch in September 2010 during training after she had just begun the working at NOI. Ms. Shanabruch wanted Relator Brown to understand the billing flow so that Relator Brown could better manage the office. As part of her training, Relator Brown observed how the billing department billed for office visits. The physicians marked the code for the office visit, and the billing department staff was expected to enter the code into the computerized billing system as the doctors directed. Billing department staff and Relator Brown could see the documentation of the office visits in the medical records. Relator Brown told Ms. Shanabruch that they were fraudulently "upcoding," because documentation in the patients' records did not justify the code that was billed. Relator Brown told Ms. Shanabruch that this was fraud and she did not want to be a part of it. Ms. Shanabruch replied that Relator Brown did not have to participate, that other employees would handle the billing. Ms. Shanabruch did not thereafter review the billings for office visits or make any changes to the way NOI billed for office visits.

**2. False Documentation of Office Visits**

54. Medicare regulations require the doctor's original signature to appear on doctor's notes. 42 U.S.C. § 1395*l*(e); Medicare Program Integrity Manual, CMS Pub. No. 100-8, ch. 3, § 3.3.2.4. The doctor's note for an office visit explains why the patient visited the physician, the patient's history, and what took place during the visit. The office visit can then be coded for billing purposes based on the level of "E&M" or evaluation and management that took place during the visit. Similarly, a surgeon's operative report details everything that happened during a surgery.

55. If the doctor's signature is not present on a doctor's note or operative report, Medicare can deny payment. Medicare allows a scribe to independently record certain aspects of

an office visit, such as the review of systems and past, family, and social history of the patient that are often gathered from an intake form. The physician, however, is required to conduct the history of the present illness, examination, and the medical decision making that takes place in the office visit and sign to certify that the physician personally performed these tasks. A scribe may document the physician's words and actions during the visit, but the notes must reflect the name of the person and that they acted as a scribe. The doctor must also review the scribe's work for accuracy.[1]

56. Relator Holden learned that NOI doctors' assistants were writing the doctors' notes and signing them, instead of the doctors themselves. Some doctors' assistants are registered nurses or licensed physician assistants, but others have no medical training or certification.

57. Dr. Mirkovic had his assistant, a physician assistant, document patient visits and sign Dr. Mirkovic's name. Dr. Mirkovic's assistant made and signed all of Dr. Mirkovic's doctor's notes, including surgery notes. Dr. Mirkovic's physician assistant was always in surgery with him. Although physician assistants may see their own patients under certain guidelines, they may not sign the doctor's name to doctors' notes.

58. Relator Brown learned that other assistants routinely signed doctors' names to doctors' notes, reviewed patient records, and ordered courses of treatment. Relator Brown also learned Dr. Wixson's assistant signed the doctor's name on prescription pads so frequently that when the doctor signed his own name, a pharmacist thought it was a forgery. Assistants

---

[1] *See* WPS Medicare, "Guidelines for the Use of Scribes in Medical Record Documentation," http://wpsmedicare.com/part_b/departments/medical_review/2009_1221_scribes.shtml.

frequently discussed how well they could sign the names of the physicians with whom they worked.

**B. Fraudulent Billing for Arthroscopic Knee Surgeries**

59. NOI billed for arthroscopic knee surgeries by using code combinations to bill for essential components of surgical services as if they were separate services. Dr. Bowen, one of NOI's principal surgeons who performed arthroscopic knee surgeries, instructed NOI employees to bill separately for each surgical entry into an individual compartment of the knee, instead of using the correct code for procedures performed on multiple compartments of the same knee. NOI engaged in fraudulent billing for arthroscopic knee surgeries between August 2008 and May 2011, and to the best of Relators' knowledge, the practice continued after May 2011.

60. Arthroscopy involves making an incision near the knee joint and inserting a small camera to visualize the joint. An injection of fluid is often given to better visualize the inside of the knee. The knee joint is comprised of three separate compartments where arthroscopic procedures may be performed. After the joint is visualized, small instruments are used to repair or trim torn or damaged cartilage or meniscus. Chondroplasty is often performed with a knee arthroscopy. Chondroplasty is the smoothing out of rough or loose pieces of cartilage that may cause pain in the joint.

61. A knee arthroscopy with meniscectomy is coded as 29881, and a chondroplasty is coded as 29877. However, when multiple procedures are performed in the same compartment of the knee, only the most complex procedure is billed. If an arthroscopy (29881) and chondroplasty (29877) were performed on the same compartment of the knee, only the arthroscopy (29881) could be billed. When multiple procedures are performed in different compartments of the same knee, a different code or code modifier must be used. If the main

procedure of an arthroscopy is performed in one compartment of the knee and a chondroplasty in another, Medicare rule require the chondroplasty to be coded as G0289 instead of 29877. Other private insurers, such as Cigna and Blue Cross, also required the use of the G0289 code, although the code was not universally required by all private insurers.

62. By billing separately for each surgical entry, Dr. Bowen artificially increased the RVUs (relative value units) performed from 1 to 10 RVUs. Payment for procedures by Medicare and other insurers is based on RVUs. Inflation of the RVUs performed thus inflates the payments made by Medicare and other payors and increases revenue to the practice at the expense of government payors. In addition, NOI's monthly bonus to physicians was based on the number of RVUs, meaning that Dr. Bowen personally profited by inflating the number of RVUs he performed in arthroscopic knee surgeries. Dr. Bowen performed approximately 10-15 arthroscopic procedures weekly.

63. According to the fees set in the 2010 Medicare Physicians' Fee Schedule for the Chicago area, the difference between coding a chondroplasty using the correct G0289 code versus the 29877 code was approximately $685. According to NOI's own fee schedule, the difference between the two codes was approximately $1235 prior to March 2010, and approximately $1765 after March 2010.

64. During her first two weeks at NOI, Relator Holden discovered that Dr. Bowen required that NOI bill improperly for arthroscopic knee procedures that he performed. Relator Holden noticed that Dr. Bowen frequently billed correctly for procedures covered by Medicare, but did not bill correctly for the same procedures when covered by other insurers, including Blue Cross and Cigna, insurers for employees of the State of Illinois and the City of Chicago, and workers' compensation. By coding the chondroplasty component of knee arthroscopy surgeries

as 29877 instead of G0289, NOI billed for each entry into a separate compartment of the knee as if it was a separate procedure, instead of part of the same surgical procedure. Billing this way increased the costs paid by these State and City health plans and programs.

65. Relator Holden recognized that Dr. Bowen's charges for knee arthroscopies were fraudulent and improper. She sent several different reports to Dr. Bowen pointing out the coding errors and also sent him a memo explaining the correct coding for these procedures. Other coders and charge posters in the department also complained that the codes they were being asked to bill were improper. Despite these complaints, Dr. Bowen would not allow the coding department to change his codes and instructed the department to code the CPT codes that he gave them instead of following the required Correct Coding Initiative, as required by Medicare. *See* CMS Program Memorandum Intermediaries, Transmittal A-02-129, § XIX (January 3, 2003) ("We will not allow billing of CPT code[] . . . 29877, *Arthroscopy, knee, surgical; debridement/shaving of articular cartilage (chrondroplasty)* [sic] with other arthroscopic procedures on the same knee.").

66. Relator Holden made several attempts to change NOI's coding and billing practices for arthroscopic knee surgeries. Relator Holden first sent an email to the NOI physicians who performed arthroscopies, Drs. Bowen, Bennett, Brander, Dolan, Ghate, Nuber, Russo, and Stulberg, on June 21, 2010, to set up a meeting to discuss correct coding. Relator Holden followed up on the email by providing the physicians with a memo explaining correct coding for knee arthroscopies and enclosing supporting references. On July 14, 2010, Relator Holden instructed the billing staff to stop billing for improperly coded knee arthroscopies. Relator Holden learned that the doctors spoke to the charge posters when Relator Holden was not present and told them to disregard her instructions and instead bill as the doctors directed.

Dianne Shanabruch also spoke with the employees in the billing department and instructed them to code and bill as the doctors requested.

67. Relator Holden sent a memo explaining her past efforts to correct the billing of knee arthroscopies to Dianne Shanabruch on May 9, 2011. Relator Holden met with Ms. Shanabruch to discuss the improper coding on June 17, 2011. Finally, following a meeting with NOI's compliance officer, Dr. Steven Kodros, on July 7, 2011, Relator Holden sent an email to Dr. Bowen on the same day and informed him of the compliance officer's recommendation to use the correct coding procedure for knee arthroscopy. In the email, Relator Holden told Dr. Bowen that she had instructed the coding and billing department that "when CPT code 29877 is performed in a separate compartment of the knee we will be coding it G0289."

## C. Fraudulent Billing for Surgical Assistants

68. NOI routinely billed for assistants during surgeries performed by NOI physicians, regardless of whether billing for a surgical assistant was allowed by Medicare regulations. NOI physicians falsely certified that no qualified residents were available in order to bill for their own assistants, and falsely billed for surgical assistants for procedures for which billing for surgical assistants was not allowed. NOI engaged in fraudulent billing for surgical assistants between August 2008 and May 2011 and to the best of Relators' knowledge, the practice continued after May 2011.

69. Under section 1842(b)(7) of the Social Security Act, 42 U.S.C. § 1395u(b)(7), Medicare Part B does not pay for surgical assistant services when surgeries are performed at teaching hospitals where qualified residents are available to provide such assistant services. In order for a physician to bill Medicare for surgical assistant services, the physician must include a statement that there was not a qualified resident available to assist. Even when a qualified

resident is not available, Medicare limits billings for a surgical assistant to certain procedures only. Medicare Claims Processing Manual, CMS Pub. No. 100-4, ch. 12, § 20.4.3. Medicare pays between 13% and 17% of the allowable cost for the surgery for surgical assistants.

70. Relator Holden discovered that NOI routinely billed for surgical assistants without including the Medicare statement regarding the availability of residents. NOI surgeons regularly performed surgery at Northwestern River North Hospital, an approved teaching hospital where residents are generally available to assist in surgery. Relator Holden noticed that surgeons billed for a surgical assistant for procedures for which a surgical assistant's services were not reimbursable under Medicare.

71. When Relator Holden first discovered that surgical assistants were being improperly billed, she attempted to resolve the problem by educating the physicians about proper billing through emails and education sessions. Relator Holden instructed physicians to add the required paragraph documenting that a qualified resident was unavailable. Relator Holden also trained the coders at NOI regarding the necessity of the Medicare statement. In December 2010, the coders told physicians that they could no longer bill Medicare for the surgical assistant charges without the required statement. Thereafter, some physicians began adding the required statement of resident unavailability to their operative reports.

72. Relator Holden learned of occasions when surgeons would not check first to see if a resident was available before beginning surgery with that surgeon's physician assistant as an assistant. On other occasions, Relator Holden learned that when a resident was available to assist in surgery, the surgeon would allow both the resident and the surgeon's physician assistant to assist in surgery and then bill for the physician assistant's surgical assistance.

73. Relator Holden found that some surgeons would bill for surgical assistants on procedures for which Medicare rules did not allow the billing of surgical assistants at all. These procedures include arthroscopic knee surgery and other arthroscopic procedures.

## D. Fraudulent Billing for Platelet Rich Plasma ("PRP") Injections

74. NOI fraudulently billed for platelet rich plasma ("PRP") injections by "unbundling" or billing the separate elements of the PRP injection as separate procedures instead of elements integral to the main procedure. PRP injections are an injection of "platelet rich plasma," prepared by processing the patient's own blood in a centrifuge to isolate the plasma component from the blood and separate out the blood cells. The plasma is then injected into a tendon or joint where the patient experiences pain.

75. The procedure is unproven and considered experimental by most insurers. As a result it is typically not covered by Medicare and most insurance plans. *See* Medicare National Coverage Determinations Manual, CMS Pub. No. 100-3, ch. 1, pts. 2 and 4, §§ 110.8, 110.14, 270.3. Many medical authorities consider the procedure to be a placebo. However, patients in severe pain are willing to undergo the procedure. A typical course of treatment involves injections administered every 3 to 6 months.

76. The "unbundling" of the elements of the PRP injections increased the cost of the procedure to payors. Because PRP injections are typically not covered by Medicare or insurance plans, the "unbundling" also allowed NOI to submit several separate claims for payment and have those claims approved, when the procedure billed under the correct code would have likely been denied. NOI engaged in fraudulent billing for PRP injections beginning in August 2008 until about March or April of 2011, when the practice was discontinued.

77. Drs. Bennett, Brander, and Russo performed PRP injections on patients with joint pain and billed these procedures to insurers, including Medicare and the State of Illinois and City of Chicago health plans. The majority of the PRP injections were performed by Dr. Bennett.

78. PRP injections were supposed to be billed under CPT code 0232T, which covers all elements of the bundled service. Instead, NOI billed separately for: 1) the office visit; 2) an ultrasound to guide the injection; 3) a blood draw; and 4) for "therapeutic apheresis or plasmapheresis," the removal of blood, separation of the plasma, and reinjection of the plasma to the patient. The cost for the unbundled services totaled approximately $1600. If bundled and billed under the correct code, the total cost was approximately $800.

79. Even if the procedure had been charged at the lower, bundled rate, knowingly billing for an unapproved procedure is illegal.

80. Relator Holden spoke with Dr. Bennett about the billing for the PRP injections, but he told Relator Holden that he did not want to change the way the procedure was billed.

**E. Fraudulent Billing for Physical and Occupational Therapy Services**

81. NOI billed for physical and occupational therapy treatments "incident to" physician supervision when no supervising physician was present. Billing for "incident to" services when no physician is present to supervise the treatment is a violation of Medicare regulations and charges for such treatment are not reimbursable. NOI engaged in fraudulent billing for physical and occupational therapy services between August 2008 and May 2011 and to the best of Relators' knowledge, the practice continued after May 2011.

82. Medicare rules allow medical practices to bill for services provided by other health care providers working in a physician's office if the services are performed "incident to" the physician's services and under the supervision of the physician. Health care providers whose

services can be billed "incident to" include physical and occupational therapists, as well as physical therapy assistants acting within their scope of practice as defined by state law.

83. At NOI's two locations, physical and occupational therapy was provided under a contract with AthletiCo, a company that provided physical and occupational therapists to the practice. Although AthletiCo was responsible for providing the personnel to render physical and occupational therapy treatment, NOI physicians were responsible for supervising them and determining the treatment they were to provide to NOI patients.

84. Medicare rules require that in order for a therapist to bill for services "incident to" physician treatment, the physician must be physically present within the same suite of offices and immediately available to provide assistance and direction during the time when the service is rendered. Medicare Benefit Policy Manual, CMS Pub. 100-2, ch. 15, § 60.1(B). However, on many occasions, NOI billed for physical or occupational therapy services when no physician was present.

85. At the Glenview location, physicians were frequently not present during late afternoon appointments. At the Chicago office, physicians were frequently not present for Friday afternoon and early morning appointments. Physical therapy appointments at the Downtown Chicago office started at 6:00 or 7:00 am and often did not end until 6:00 or 7:00 pm. Beginning in 2008 and continuing through 2011, physicians were not present in the office during the early morning visits as well as those that took place later in the day in the Downtown Chicago office. Often, physicians would leave the Downtown Chicago office early on Friday afternoons while physical therapy services continued and were billed "incident to." In addition, between June 22, 2011 and July 25, 2011, physical and occupational therapy services were performed and billed at

the Glenview office with no physician present because a doctor who had normally been on the premises was on maternity leave.

86. Relator Brown was concerned that billing for physical therapy when no physician was present to supervise was improper and fraudulent and discussed the issue with Dianne Shanabruch. AthletiCo's physical therapy manager was also concerned. On June 22, 2011, AthletiCo manager, Jennifer Henry told Dianne Shanabruch that "we shouldn't be seeing patients because there are no doctors." Ms. Henry was concerned because AthletiCo could not bill under its own Medicare provider number and received payments for its services only as a result of NOI billing these therapy services as "incident to" and under NOI's Medicare provider number. Ms. Henry discussed this issue several times with Relator Holden. Despite these concerns, the practice continued to see and bill for patients under the "incident to" provisions, even when no physician was present on site.

87. In March 2011, Relator Brown attended an auditing conference where billing for occupational and physical therapy services were discussed. One topic at the conference was billing for these services "incident to" when a supervising physician was not present. Relator Brown had previously reported to Dianne Shanabruch that NOI had been billing improperly for occupational and physical therapy services. After attending the conference, Relator Brown again approached Ms. Shanabruch about these billing practices and suggested a review. Ms. Shanabruch told Relator Brown that she should not review past billing for these services because the doctors did not want a review done.

## F. Wound Debridement by Unlicensed Providers

88. NOI fraudulently billed for wound care procedures, including the debridement of wounds, that were performed by individuals who were not licensed to perform such activities.

NOI engaged in fraudulent billing for wound debridement and wound care procedures between August 2008 and June 2010.

89. Wound debridement is the use of a surgical instrument to trim away or otherwise remove dead skin from a wound to promote healing. Wound debridement is within the scope of practice of physicians, physician assistants, nurse practitioners, and physical therapists, but it is not within the scope of practice of occupational therapists or occupational therapy assistants. 225 Ill. Comp. Stat. 75/2(6). Medicare rules do not allow occupational therapists to bill for active wound care procedures. 42 C.F.R. § 484.4; Medicare Benefit Policy Manual, CMS Pub. 100-2, ch. 15, § 230.2; WPS Medicare, "Physical Therapy and Occupational Therapy Questions and Answers," http://www.wpsmedicare.com/part_b//resources/provider_types/ptot_qa.shtml. Furthermore, Medicare will not pay for treatments that are outside of the scope of a provider's licensure. 42 C.F.R. §§ 484.4, 485.705, 485.707(b), 485.713; Medicare Benefit Policy Manual, CMS Pub. 100-2, ch. 15, §§ 230.1, 230.2, 230.5.

90. If wound care activities are billed "incident to" physician treatment, the payor (Medicare or the insurer) is not aware that the treatment is being performed by unlicensed providers because "incident to" billing is always billed under the physician's name. The payor would only see the name of the physician who ostensibly supervised the procedure but would not know who actually performed the treatment or whether that person was licensed to perform it.

91. Based upon the billings Relator Holden reviewed and the tenure of various staff involved in wound debridement and billings for wound debridment, NOI's billings for unlicensed personnel performing wound debridement date back at least to 2008. Wound debridement was very common at NOI, with procedures commonly scheduled to be performed on a daily basis.

92. In June 2010, Relator Holden learned that occupational therapists and occupational therapy assistants were performing wound debridement and other wound care, including the excision and dressing of wounds, that was outside of their scope of practice. Dr. Charles Carroll had developed a policy and training to allow the occupational therapists and occupational therapy assistants to conduct wound care activities at NOI. These practitioners were regularly scheduled to perform wound debridement and other wound care activities. Relator Holden wrote a memorandum that was circulated to the physicians and explained that NOI could not lawfully bill for these services. Relator Holden also discussed the matter with Dianne Shanabruch, who agreed to a voluntary refund of approximately 5 of the most recent Medicare claims for wound debridement. However, Ms. Shanabruch instructed Relator Holden not to review any other billings in the past to determine if past billing merited a refund.

93. After the voluntary refund was complete, Dianne Shanabruch removed evidence of the refund from Relator Holden's access. Ms. Shanabruch took Relator Holden's paper file documenting the refund. Ms. Shanabruch did not allow Relator Holden to keep copies of the check and voluntary refund form sent to Medicare. In addition, Ms. Shanabruch instructed the information technology administrator at NOI to delete an email that Relator Holden had sent to the doctors regarding the necessity of the refund.

94. After the voluntary refund of just 5 of the fraudulent debridement claims, the practice of allowing occupational therapists and occupational therapy assistants to perform wound debridement and other wound care activities was discontinued.

## G. MRIs

95. NOI fraudulently billed for MRI imaging by using improper diagnosis codes or tax identification numbers. NOI engaged in fraudulent billing for MRIs between August 2008 and December 2010.

96. NOI owns an MRI (magnetic resonance imaging) machine at its Downtown Chicago office. The office performs approximately 25 to 30 MRIs a week. MRIs are commonly performed prior to knee, ankle, or hand surgery to evaluate a patient's injury. The cost of an MRI depends on the part of the body scanned and the resolution of the image. A typical MRI of the knee costs up to $1700 and a typical MRI for both knees costs $2300.

97. Because MRIs are costly, insurers limit their use. Nearly all forms of private insurance, including the insurance plans covering employees of the State of Illinois and the City of Chicago, require precertification before an MRI is performed. Medicare does not require precertification but restricts the diagnosis codes for which it will pay for an MRI. *See* Medicare National Coverage Determinations Manual, CMS Pub. No. 100-3, ch. 1, pt. 4, § 220.2(B), ©, (D); Medicare Claims Processing Manual, CMS Pub. No. 100-4, ch. 13 § 40.

98. NOI obtained fraudulent precertification or payment for MRIs in two ways. For some patients, the MRI clerk responsible for obtaining the precertifications called the insurer to obtain the precertification, using a diagnosis code that was known to be payable, regardless of the patient's actual diagnosis. The clerk did not use or refer to the actual diagnosis in the patient's chart when obtaining the precertification from the insurer. For State of Illinois employees under the Cigna health plan, the clerk called Cigna and used a tax identification number for a predecessor company to NOI instead of NOI's actual tax identification number. NOI used the wrong tax identification number because NOI itself did not have a contract to be an MRI

provider for Cigna. NOI performed approximately 1 or 2 MRIs per week for state employees covered by Cigna.

99. An intern in NOI's billing department became aware that the department was using the wrong tax identification number for MRI precertification and informed Relator Holden. Relator Holden alerted NOI executive director Dianne Shanabruch in late 2010. Ms. Shanabruch determined that no voluntary refund or correction was to be performed for fraudulent precertifcations or diagnosis codes, but that the practice would be discontinued.

## VI. CLAIMS FOR RELIEF

### COUNT I
### False Claims Act - Presentation of False Claims
### 31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A) as amended in 2009

100. The allegations of the preceding paragraphs are re-alleged as if fully set forth below

101. Through the acts described above, Northwestern Orthopaedic Institute and its agents and employees knowingly presented and caused to be presented to an officer or employee of the United States Government a false and/or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1), and, as amended 31 U.S.C. § 3729(a)(1)(A).

### COUNT II
### False Claims Act - Making or Using False Record or Statement to Cause Claim to be Paid
### 31 U.S.C. § 3729(a)(2), 31 U.S.C. § 3729(a)(1)(B) as amended in 2009

102. The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

103. Through the acts described above and otherwise, Northwestern Orthopaedic Institute and its agents and employees knowingly made, used, and/or caused to be made or used

false records and statements in violation of 31 U.S.C. §§ 3729(a)(2), and, as amended 31 U.S.C. § 3729(a)(1)(B) in order to get such false and fraudulent claims paid and approved by the United States Government.

**COUNT III**
**False Claims Act - Making or Using False Record or Statement to Conceal, Avoid and/or Decrease Obligation to Repay Money**
**31 U.S.C. § 3729(a)(7), 31 U.S.C. § 3729(a)(1)(G) as amended in 2009**

104. The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

105. Through the acts described above, in violation of 31 U.S.C. § 3729(a)(7) and as amended, 31 U.S.C. § 3729(a)(1)(G), Northwestern Orthopaedic Institute and its agents and employees knowingly made, used, and caused to be made or used false records and statements to conceal, avoid, and/or decrease Northwestern Orthopaedic Institute's obligation to repay money to the United States Government that Northwestern Orthopaedic Institute improperly and/or fraudulently received. Northwestern Orthopaedic Institute also failed to disclose material facts that would have resulted in substantial repayments to the United States.

**COUNT IV**
**Illinois False Claims Act**
**740 Ill. Comp. Stat. 175/1 *et seq.***

106. The allegations of the preceding paragraphs are realleged as if fully set forth below.

107. This is a claim for treble damages and civil penalties under the Illinois False Claims Act. 740 Ill. Comp. Stat. 175/1 *et seq.*

108. By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to the Illinois Medicaid Program false or fraudulent

claims for the improper payment or approval of medical treatment provided under the Illinois Medicaid Program, the Illinois State Employee Insurance and Benefit Programs, and the Illinois Comprehensive Health Insurance Plan.

109. The Illinois Medicaid Program, the Illinois State Employee Insurance and Benefit Programs, and the Illinois Comprehensive Health Insurance Plan, unaware of the falsity or fraudulent nature of the claims caused by the Defendant, paid for claims that otherwise would not have been allowed.

110. By reason of these payments, the Illinois Medicaid Program, the Illinois State Employee Insurance and Benefit Programs, and the Illinois Comprehensive Health Insurance Plan has been damaged, and continues to be damaged in a substantial amount.

**COUNT V**
**The City of Chicago False Claims Act**
**Chicago Municipal Code, § 1-22-010 *et seq.***

111. The allegations of the preceding paragraphs are realleged as if fully set forth below.

112. This is a claim for treble damages and civil penalties under the City of Chicago False Claims Act. Chicago Municipal Code § 1-22-010 *et seq.*

113. By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to the City of Chicago false or fraudulent claims for the improper payment or approval of medical treatment provided under the health insurance plans or workers' compensation insurance plans applicable to employees of the City of Chicago, and used false or fraudulent records to accomplish this purpose.

114. The City of Chicago, unaware of the falsity or fraudulent nature of the claims caused by the Defendant, paid for claims that otherwise would not have been allowed.

115. By reason of these payments, the City of Chicago has been damaged, and continues to be damaged in a substantial amount.

**COUNT VI**
**False Claims Act Retaliation Violation**
**31 U.S.C. § 3730(h)**

116. The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

117. Relators Holden and Brown took lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section and, as such, engaged in protected activity under the False Claims Act and other laws.

118. Relator Holden sent a series of emails, memos, and requests for meetings to the physicians at NOI who were involved in the above-described fraudulent schemes. She also discussed these issues with the practice's executive director, Dianne Shanabruch. When the emails and meetings did not yield any results, Relator Holden arranged a meeting with NOI's compliance director, Dr. Kodros, on July 7, 2011. In the meeting, Relator Holden discussed all of the compliance problems that she had identified and explained that she had tried to set up a meeting with all NOI physicians about these issues. Dr. Kodros instructed Relator Holden to send emails to the NOI physicians, except Dr. Bowen, about the compliance issues discussed in the meeting.

119. A few days after the July 7, 2011 meeting, Dr. Bowen demanded a personal meeting with Relator Holden because he was angry that she had scheduled a meeting with the compliance officer. Relator Holden said that she would not meet with him to discuss what happened in the meeting with Dr. Kodros unless Dr. Kodros was also present. Dianne

Shanabruch told Relator Holden that she needed to meet with Dr. Bowen "or else," and not to challenge Dr. Bowen on compliance-related issues. Relator Holden believed that NOI was unwilling to rectify its fraud and that she had no options other than to leave NOI or to continue to perpetrate fraud. Her last day at NOI was July 13, 2011.

120. Relator Brown told Dr. Bowen in April or May 2011 about improper billing practices that had occurred at NOI involving several payors. Relator Brown suggested that the practice do a voluntary refund for charges that had been overbilled. Dr. Bowen instructed Relator Brown not to refund the improperly billed funds.

121. After attempting to report and correct the billing fraud that she was aware of, Relator Brown believed that NOI was unwilling to take steps to remedy the fraud, and she had no choice other than to leave NOI. Relator Brown's last day of work at NOI was August 1, 2011.

122. Defendants NOI, Mark Bowen, and Dianne Shanabruch without good cause harassed, intimidated, and otherwise created a hostile work environment for Relators Holden and Brown in retaliation for their objections to, and reporting of, Defendants' wrongdoing. Defendants knew or should have known that Relators Holden and Brown's activities investigating and opposing their unlawful conduct, including investigation for, testimony for, or assistance in an action filed under this section, were in connection with the False Claims Act action.

123. Defendants retaliated against Relators Holden and Brown for their lawful actions taken in furtherance of a False Claims Act action and the DOJ investigation of Northwestern Orthopaedic Institute, including, but not limited to, their investigation and assistance in an action alleging Defendants' violations of the False Claims Act and Relators Holden and Brown's efforts to prevent further False Claims Act violations by Defendants. Relators Holden and Brown

reported, at various times, all of the above violations of law recited in this complaint to their superiors at Northwestern Orthopaedic Institute prior to filing this action.

124. Defendants have a duty under the False Claims Act, 31 U.S.C. § 3730(h) to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section and federal investigations.

125. Defendants' misconduct and illegal treatment of Relators Holden and Brown and those they derogatorily consider "whistleblowers" has the effect of stifling reports of violations of Federal law, including Medicare payment regulations. This treatment effectively warned other Northwestern Orthopaedic Institute employees that they should not engage in honest and open reporting of Defendants' conduct.

126. The actions of Defendants damaged and continue to damage Relators Holden and Brown in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

**COUNT VII**
**Illinois False Claims Act Retaliation Violation**
**740 Ill. Comp. Stat. 175/4(g)**

127. The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

128. Defendants have a duty to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of an action under the Illinois False Claims Act. Relators engaged in lawful acts in furtherance of efforts to stop one or more violations of the Act.

129. The actions of Defendants damaged and continue to damage Relators Holden and Brown in violation of 740 Ill. Comp. Stat. § 175/4(g), in an amount to be determined at trial.

**COUNT VIII**
**City of Chicago False Claims Act Retaliation Violation**
**Chicago Municipal Code, § 2-152-171**

130. The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

131. Defendants have a duty to refrain from taking retaliatory actions against employees like the Relators who disclose violations of laws, rules, or regulations by city contractors and who provide information or testify about such violations.

132. The actions of Defendants damaged and continue to damage Relators Holden and Brown in violation of Chicago Municipal Code § 2-152-171, in an amount to be determined at trial.

**COUNT IX**
**Illinois State Public Policy Tort: *Palmeteer* Claim**

133. The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

134. At all times pertinent hereto, Northwestern Orthopaedic Institute was doing business in, and deriving substantial revenue from business in the State of Illinois. Relators Holden and Brown were employed in the practice's main office in Chicago, Illinois.

135. The State of Illinois, by and through its Medicaid assistance to low income and disabled persons, its health plans for State of Illinois employees, and its Illinois Comprehensive Health Insurance Plan, has paid for Defendants' medical services.

136. It is the public policy of the State of Illinois that illegal conduct, including theft by deception and fraud, fraud on a governmental entity, fraud against the Medicaid, Medicare, and public health care systems and publicly-funded health programs and insurance shall not be tolerated.

137. It is the public policy of the state of Illinois that theft offenses, including theft by deception, shall not be tolerated.

138. It is public policy of Illinois that witnesses to criminal activity shall not be intimidated or coerced, as evidenced by 720 Ill. Comp. Stat. 5/12-6 and 720 Ill. Comp. Stat. 5/32-4a, among other statutes and regulations, such that the policy against theft through fraud may be furthered by the law enforcement and judicial systems.

139. It is the public policy of Illinois that no one shall obstruct justice as evidenced by 720 Ill. Comp. Stat. 5/31-4.

140. It is the public policy of Illinois, as found in constitutional, statutory and regulatory provisions, that persons shall be free to express themselves on matters of public interest.

141. Relators reasonably believed that Defendants were defrauding the Federal, State, and City governments when they improperly billed for medical services provided by Northwestern Orthopaedic Institute in violation of Medicare regulations and insurance company policies.

142. Relators repeatedly protested Defendants' actions internally and were eventually terminated as a result of their opposition to Defendants' illegal activities.

143. Adverse employment actions taken against one opposing such activities jeopardize the public policies identified above.

144. As a direct and proximate result of the retaliation against them for opposing the conduct, Relators have suffered extreme emotional and mental anguish, have lost self-esteem, suffered humiliation, lost income and benefits, and will suffer further such injuries and losses in

the future. As a direct and proximate result of the retaliation, Relators were harmed and suffered professional harm to their reputations and earning capacity.

**PRAYER FOR RELIEF**

WHEREFORE, Relators Holden and Brown request that judgment be entered against the Defendants, ordering that:

1. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*, the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq.*, and the City of Chicago False Claims Act, Chicago Municipal Code, § 1-22-010 *et seq.*

2. Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of the Defendants' actions;

3. Relators be awarded the maximum "relators' share" allowed pursuant to 31 U.S.C. § 3730(d) and the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/4(d), and the City of Chicago False Claims Act, Chicago Municipal Code, § 1-22-030(d);

4. Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d), the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/4(d), and the City of Chicago False Claims Act, and Chicago Municipal Code, § 1-22-030(d);

5. Relators be provided with injunctive or equitable relief, as may be appropriate, to prevent further harm to themselves and to prevent the harm to others and the public caused by Defendants' retaliation against whistleblowers;

6. Relators be awarded all litigation costs, expert fees, and reasonable attorneys' fees incurred as provided pursuant to 31 U.S.C. § 3730(h), 740 Ill. Comp. Stat. 175/4(g), Chicago Municipal Code, § 1-22-030(d), and other applicable law;

7. Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

8. Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

9. Relators be awarded all other damages to which they are entitled, including compensatory and punitive damages; and

10. The United States, the State of Illinois, the City of Chicago, and Relators recover such other relief as the Court deems just and proper.

**Relators hereby demand a trial by jury.**

Respectfully submitted,

Robin Potter

One of Relators' Attorneys

Robin Potter, # 3123932
Denise M. Quimby, # 6286565
Robin Potter & Associates, PC
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Phone: (312) 861-1800
Fax: (312) 861-3009
*robin@potterlaw.org*
*denise@potterlaw.org*

Mark Hanna
Lorrie Bradley
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006
Phone: (202) 223-2620
Fax: (202) 223-8651
*mhanna@murphypllc.com*
*lbradley@murphypllc.com*

Ann Lugbill
Murphy Anderson PLLC
2406 Auburn Avenue
Cincinnati, OH 45219
Phone: (513) 784-1280
Fax: (877) 784-1499
*alugbill@murphypllc.com*

**Attorneys for Relators Holden and Brown**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the **RELATORS' QUI TAM COMPLAINT**, was filed *in camera* and *under seal* pursuant to the Federal, Illinois, and Chicago False Claims Acts and was served upon the following parties on November 3, 2011 as indicated below.

Honorable Eric H. Holder Jr.
United States Attorney General
Attn: Joyce Branda
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
Phone: 202-307-0231
**via U.S. Certified Mail**

Linda A. Wawzenski, Esq.
Assistant U.S. Attorney and Deputy Chief
United States Attorney's Office
219 S. Dearborn Street, 5th Floor
Chicago, IL 60604
**By Delivery**

Patrick Keenan, Esq.
Assistant Attorney General and Bureau Chief
100 W. Randolph St., 12th Floor
Chicago, IL 60601
**By Delivery**

Susana Mendoza
Clerk of the City of Chicago
City Hall, Room 107
121 N. LaSalle Street
Chicago, IL 60602
**By Delivery**

/s/ Robin Potter
Robin Potter